Mr. Martin May it please the court. Jared Paul Martin on behalf of Reggie Pettus. Somebody put Martin on mine. Sorry, I have the same. Could you give me your first name again? Your last name again? Martin. Martin. Okay, yes, thank you. Martin. That's what I said. Didn't I say Martin? No, no. I think we're good. I'm sorry, Your Honor. Mr. Pettus, this case involves three guidelines errors resulting in a sentence near the statutory maximum for Mr. Pettus. Because of limited time, I would like to focus on the discharge of a firearm and obstruction of justice enhancements. If there are any questions regarding those other enhancements, I'm happy to answer them, but otherwise I'll rely on the briefing on those issues. First, the discharge of a firearm enhancement was due rather than the narrower provision of 1B1.3A1. The government doesn't dispute the application of 1B1.3A2 would be procedural error under Horton, and the government doesn't dispute that it argued only for the broader provision of A2, which is the erroneous provision. But the PSR cited A1, right? That's correct. The PSR did cite A1. And the district court said it was overruling the objections to the PSR? No, it did not. The court... I'm sorry? It said it was overruling the objections to the PSR? The court? The district court said I overruled the objections to the PSR. Oh, that's correct. Yes. I'm sorry, Your Honor. I misunderstood you there. And the district court later adopted the PSR? That's correct. So can I ask you, on this, this is full cards on the table. I have read pages 79 and 80 to the JA like a million times, and I am genuinely confused about what's going on here. So the problem is, I think first, is that we're talking mostly about the brandishing provision, which you're not raising this morning, which I think is probably a good idea. But so we get then, and then, so we get to the, there's the point where the government says, if I might, I think there's one more objection. This is the bottom of 79. This is when this A1, A2 issue comes up. And it's the cross-reference to 26. And then defense counsel says they assume that the judge had already ruled on that, which I think was just wrong, because I don't think the judge had ruled on that yet. So then the judge says, I will overrule that objection. Then we talk a little bit. And then the government says, this is line 16 to 18, and we would ask the court also to make a finding. And then the government says something that sounds a lot like A2. And then the court says, I'll my problem. I can interpret this in two ways. One possibility is that the court overrules the objection to the PSR, makes the A1 finding, and then the government, in the interest of a belt and suspenders, asks for the A2 finding, and the court makes that too. That's one reading. Another reading is that the court just makes the A2 finding. And when I read this transcript, I genuinely have no idea which of those two things happened. So would you like to try to help me out on that? Because I, if you ask me what ground did the district court rely on, I have no idea. I will try my best, your honor. So our position is that the court did adopt A2, and we believe the record demonstrates that for three reasons. First, the government asked the court to apply A2, and it sends me memorandums. Right. So for me, the debate is not whether they did A1 or A2. The debate is between is it A1 and A2, or is it just A2? So if you're going to point me to evidence that it might've been A1 or A2, that's not helpful to me. How does it tell me whether it was A2 alone or A1 and A2? I agree the government's sentencing memo cited A2, but that doesn't help me because the PSR cites A1. Correct. So I would direct the court's attention to the language of the Note 5B, and it uses part of a spree or ongoing series of offenses and time interval between the offenses. I totally agree that when the government asks the court to make that finding, the government is using language that sounds a heck of a lot like A2. Agree with that? Sure. But how do I know that when the court says, I will overrule that objection, and when the court says later, I'm adopting the PSR, that it's not also making an A1 finding? Now, I'll preface this too. I'm not sure there's evidentiary support for an A1 finding, but that's a different question of what finding the court made. So as far as the adoption of the PSR, the court has to rule on disputed portions of the PSR, and which provision to apply was in dispute. And so our position is the court had to make a ruling on what disputed provision applied, and the court adopted the government's position, because as your Honor said, that language in the note is so similar to the language of sequence used by the government. And again, the government does dispute that it argued for the broader provision of A2. And second, under Rogers, the statements of the court at sentencing control. Right, but the court says, I will overrule that objection. What is that? That's an objection to the PSR. This is JA page 80, lines 9 to 10. The court says, I will overrule that objection. So he overruled the objection by the defendant, right? Which is an objection to what? It's an objection to the PSR. Correct. Okay. And so the way that I read that is the court then adopted what the government was arguing, which is A2. And I think it's important, and you highlighted this earlier, the court made no findings regarding offensive conviction or avoiding detection under A1. The PSR's only explanation for citing A1 is that the firearm was discharged at least three times during the offensive conviction. That statement does not provide any information or underlying evidence and explanation as to whether the discharge occurred during the commission of the offense, or that the discharge occurred to avoid detection or responsibility. This court is prohibited from presuming the sentencing court has silently adopted arguments in support of an PSR never presented by a party under Carter, Bolden, Mitchell. Because the government never argued for application and enhancement under A1, and because the PSR was silent as to which prong of A1 applied, the court never made a finding that Mr. Pettis's discharge was part of the offense or an act of avoiding responsibility. Were there any facts in the record that would have supported such a finding that the discharge occurred in the course of attempting to avoid detection or responsibility for the robbery? There's not, Your Honor, and you really bring me to my next point. The government creates this new escape theory for the first time on appeal, but there is no evidence that Mr. Pettis discharged the firearm to avoid responsibility. It's the government's burden. The government did not argue the escape theory below, and it's the government's burden to prove the enhancement through its escape theory. There was no evidence presented that Mr. Pettis discharged the firearm to avoid responsibility for the chain snatching. The court should reject the government's attempt to make up evidence that's not in the record below, and the government's new escape theory is baseless because Mr. Pettis acted in self-defense when he discharged the firearm to prevent imminent death or bodily harm. The government's own statement of stipulated offense conduct supports that Mr. Pettis fired shots in self-defense. The government stated Pettis has consistently stated that he was shot in the head. I don't know how the government conceding that your client has consistently insisted something is the government conceding that that thing is true. Well, they didn't disprove the self-defense, and they entered into an offense, a stipulated offense, and that really supports Mr. Pettis's self-defense claim. You just basically said they've stipulated it was self-defense. I'm not sure it's fair to say they've stipulated it was self-defense. I'm sorry, Your Honor. I don't think I follow that. I'm sorry. It doesn't matter. I apologize. Yeah, so the government stated that JB's account was consistent with Mr. Pettis's account that he was the victim of drive-by shooting, and the government stated it cannot confirm or refute that he was the victim of a drive-by shooting. The government stated that they've been unsuccessful in locating Sally and that he was not responding to law enforcement. In fact, Sally had been charged with concealing a weapon. So I think all of those factors dispute the government's new escape theory, and all of those factors support that Mr. Pettis acted in self-defense when Sally came after him and shot him in the head and then continued to follow him. Under these circumstances, the government could not disprove Mr. Pettis's self-defense claim, and that's why they didn't attempt to disprove it at sentencing, and it's their burden. The applicability of the discharge enhancement was disputed, and the government simply cannot meet its burden of proving the applicability of the discharge enhancement through escape because Mr. Pettis acted in self-defense. And finally, the government's escape theory, it really makes no sense. Can you tell me about the obstruction enhancement? Sure. First of all, the district court erred by applying the obstruction of justice enhancement because the totality, first of all, the concealment of the firearm was contemporaneous with the arrest because the totality of the circumstances demonstrate that the concealment was a hurried, unplanned, responsive reflex to imminent police contact. A couple of factors to support that. First, Mr. Pettis had just been shot in the head and was in an agitated and frenzied state when he concealed the firearm. Second, he fired three shots in self-defense in the city center of uptown Charlotte, where officers were located just across the street. Third, those police officers who were responding to reports of shots fired saw Pettis run into the epicenter parking garage. Does it matter whether he knew that police saw him run into the garage? I think it does, yeah, because that shows it was a reflexive response to imminent police contact. Is there evidence in the record that Mr. Pettis knew police were pursuing him or saw him, I should say, when he entered the garage? Well, that's what the government said on July the 77th. So the government said, and really the facts of it. That's not what they say. What they say is he knows the police are coming. That is different from saying he knows the police saw him run into the garage. Okay, that's an important distinction. I'm sorry about that. That's true. But I think the circumstances support that he knew police were on his trail. If you look at the situation that was going on, this was uptown Charlotte, pre-pandemic, the epicenter. Bars had just let out. Everyone knows from Charlotte there are going to be a lot of police around, and shots were fired. And the record shows that police were right across the street. So of course he's going to know that he's running away from the area where shots were just fired. Police are going to suspect him. And he knew that they were on his trail. And that's really why he concealed the firearm. Why else would he do it unless he knew police were following him? I mean, I can see plenty of reasons why a person might conceal a firearm without knowing the police are already following you, right? I mean, think about, this is a completely different factual scenario. But like, and admittedly, it's a reference to movies and TV. But like, you hire an assassin to kill someone. The assassin walks up to someone on behind a busy street. They keep walking. And a block later, they throw the gun in the trash can. Like, I can see reasons why people would dispose of a firearm without knowing the police are already on them. That doesn't seem plausible to me. That the only reason you might ever dispose of a firearm after committing a crime is that you know the police are already on you. Yeah, I just think that the facts in this case are very specific because the heavy police presence, they were right across the streets. He had just discharged a firearm. I think it's reasonable to assume he knew they were on him and he concealed it. And right after they were following him, they're asking questions. So I believe just the factors here show that it was, you know, a reflexive response to imminent police contact. He knew police were present. He disposed of the firearm. The problem is, the more I hear that this is really fact-y, this starts to sound like a finding of fact. And it starts to sound like something that's reviewed for clear error. So what, let me ask you a thrush, what do you think is the standard of the question of whether this enhancement is satisfied here? Is it de novo or clear error? So I think it's de novo, but for the factual finding, it's clear error. Okay. But things like what's going on in Charlotte and what this individual knows and how quick is it? And did the police see him? Those are all factual questions, right? Yeah. And I think they're important facts. So what's the legal, so I guess, let me take a step back and flip start. What of this is a legal question? I mean, I guess the meaning of what contemporaneous is, is a legal question. What do you think is the legal question that's reviewed de novo? Yeah. Whether or not it's the firearm was concealed contemporaneously with the arrest. No, no, no. I mean, I think what it means for the firearm to be concealed contemporaneously is a legal question, but whether it was concealed contemporaneously under all the facts and circumstances of a given case isn't a finding of, isn't an issue of law, is it? I think I agree with that, Your Honor. Yes. And then I would also say that this was not a material hindrance. To be a material hindrance, there has to be at least some actual negative effect on either the course or the result of the investigation. And there is no actual negative effect here. And we know that for a couple of reasons. First, police knew that there had been two separate incidents of shots fired and the government stated the officers were trying to find the shooters. Second, police reasonably suspected another individual had shot Pettis after they observed a wound on Mr. Pettis' scalp from which a metal fragment was removed. Third, when Mr. Pettis was arrested, police had not located the person who shot him in the head. Thus, officers had an independent obligation to make sure the community was safe. And fourth, the 15 to 20 minutes of investigative time to locate the firearm would have occurred even if Mr. Pettis had told officers about the concealment because they still would have to have to search the area for the person who shot Mr. Pettis in the head. So 15 to 20 minutes is not very long to make sure the area is safe or there's just been an active shooter and a person shot in the head. And I see that my time is just about up, so unless you have any further questions, I'm happy to reserve the rest for rebuttal. All right. Thank you, Mr. Martin. Ms. Ray? Good morning, and may it please the Court. Amy Ray for the United States. Your Honors, I'll start, I guess, with addressing the question of whether or not the District Court made a that this was not in dispute in the District Court. There was no conversation about which subsection should apply because the pre-sentence report said A-1. Yes, the government made reference to A-2 in its sentencing memorandum, but as Judge Heitens, as you have referred to, when this came up initially at sentencing, first of all, the defendant said, I have two objections. And he said, I want to object to the four-level enhancement, and I want to object to obstruction. He went through all of those. The District Court ruled on those, and he says, I have no further objections. And on page 79 of the appendix, the government says, well, wait a minute, didn't you, I think he also objected to the discharge, the cross-reference, which made a difference of one offense level. And then the defense attorney says, oh, right, but I thought that that was already incorporated. Basically, I thought you already addressed that when you addressed the four-level increase. And so the notion, in other words, was as long as you find a connection between the brandishing and you thought all of that, then you've already made the seven-level increase objection. District Court says, right, I overrule that objection, referring to the pre-sentence report. The government then, and I would suggest out of an abundance and appropriate caution for this court, says, well, wait a minute, there was also this seven-level increase. And, you know, we would request for the appellate record that the court make a finding that it was relevant conduct. And then he refers to the same sequence of events. And the court says... And the judge, of course, did not make a finding that the discharge was in the course of attempting to avoid detection or responsibility for that offense. That seems to be the government's position now. Wasn't argued below by the government. Wasn't found by the court. What is the evidence to support the cross-reference under 1B1A1? The evidence, Your Honor, is, first of all, this was part of the robbery offense happens. He yanks the chain. Well, let me refer to two specific pieces of evidence that may be most helpful. The first is on page 111 of the... Well, actually, let's go to 130 to 131 in the pre-sentence report. The pre-sentence report notes that the victim said that the defendant had his car keys after their struggle. So if the brandishing, the brandishing happens when they're about that brandishing issue. And I'm happy to address that. But the brandishing happens after the victim follows and chases down Mr. Pettis. And during that conflict, there is evidence in the record that the car keys fell out and that Mr. Sally believed that Mr. Pettis had his car keys. That's on page 130 to 131. And on page 111 of the appendix, the defendant himself in his sentence, first set of objections to the pre-sentence report says the victim alleged that his keys were missing. And when, what happened was when he encountered Mr. Pettis near the epicenter, he was standing by his car and said, where are my keys? And that Mr. Pettis opened fire, fired three shots at him and that he ducked down. That is all in the pre-sentence report. Okay. Connect the dots for me. How does that support? Because your honor, if, if we take the robbery and we have a victim and the victim is then chasing him down and attacks him, he's trying to escape consequences for that robbery. He, he, you know, brandishes the firearm. The discharge happens an hour later though. That's right. And this court has recognized the time isn't an issue. It's not a question of time because, uh, uh, something can affect, can be considered to be in connection with even four years later. Is it your position that he discharged the firearm attempting to avoid attacks and responsibility because he wanted to kill the victim to prevent the victim from then testify against him later for the robbery? It's, it's all part. Yes. It's not necessarily, I wouldn't go so far as to say to avoid testifying. I don't think it has to be a legal, as long as you're doing it during an attempt to escape responsibility and by escaping responsibility, he's got the victim who's still trying to hold him accountable and saying there, and there are police all around. And so he shoots at the victim for the same reason he brandished the firearm, which is basically, Hey dude, back off. I may have stolen your necklace, but you need to back off. Was he beating him at the time? No, no, no, no. That's when he was brand. Yes. When he was brandished. Yes. Well, he was beating. Yes. But that wasn't part of the robbery. Was it? It was completed. Well, your honor, the, it, it was an attempt to avoid detection or escape for the consequences of the robbery. Because at that point, the victim has him, he's beating him. He could say, you know, I'm going to take you to the police. He had, he was a much, much bigger man than Mr. Pettis. And Mr. Pettis brandishes the firearm again to say, back off. You better get out of here. I've yeah, you got your necklace back, but you've got to go away because I'm not going to be held responsible for what I did to you. Same thing an hour later, when he encounters him downtown near the epicenter. And so all of it is a chain of events. All of it relates back. It is a, but for sixth circuit has represented, has, has recognized sort of a, but for causation, but for that robbery, he wouldn't be shooting at the victim an hour later. Don't we need the district court to make these findings which weren't made? Your honor. No, because in this case, the district court did by overruling the objection, find that it was relevant conduct. We don't ask district courts to explain every subsection under the guidelines that the district court is relying on. And there was no dispute in the district court. The defendant never said in the district court, your honor, we think it's a one and they're saying it's a two. That question was never presented to the district court. The district court's responsibility was to find relevant conduct in the district court did. And that is why this is a good should this court find that the record is unclear to affirm on any ground in the record, because the question was the guideline enhancement. Was it appropriately applied? If this court can say it was appropriately applied. And I understand that your honors have questions about whether it could be appropriately applied under a wine, but remember, that's also a clear error standard of review. Did the district court. Okay. Let's, let's say counterfactually, let's say I read this as saying the district court found it under a two. I know you don't agree with that, but let's say, let's posit the district court did. We can't then affirm based on a one. Can we? Because if, because it seems to me if the government's views, these are all findings of fact, if the district court didn't make the requisite findings under a one, whether the evidence would be sufficient to support that finding under a one, or whether it would be sufficient to survive clear error review under a one is different from the question of whether the government, the district court actually made that finding, right? We can't affirm on an alternative factual basis. If we conclude the district court didn't rely on that alternative factual basis. Your honor, with all due respect, I disagree for this reason. The, the, the error would be applying the wrong guideline range, the guideline provision, the incorrect guideline provision. So whether or not it was in the, um, the a one, which would require during, or in preparation for, or in an attempt to avoid responsibility for, or whether it's a broader provision, the error is the misapplication of the, the wrong guideline. And this court in more than one case, I would refer the court specifically to, there's an unpublished decision, United States versus Vennie 2019. There's also 2002 decision in Farid. This court applies that under on any other ground that's evident by the record. Unpublished in reference to both of those opinions. Pardon me? Did I hear the words unpublished in reference to both of those? Only, only this, the first one, your honor. And I'm acknowledging that that one, which is more specific because it's the erroneous application of the guideline range in Farid. It was a question of whether or not the district court aired in the, actually the statutory, um, support for a supervisor lease sentence. And that was a published case. This court routinely will apply the rule of, we will affirm on any ground that's clear in the record where the error is a legal error. And the facts, the facts here are not disputed in terms of whether or not, or the timing of what happened. They may be disputed about what prompted Mr. Pettis to fire there. For example, I don't think that it was clear to the police that's particularly not in those first 20 minutes that there were two shooters. That wasn't something they, they were skeptical, I think, at that point about whether or not there were two shooters. It just wasn't known, which is why the government's memorandum, when it writes, says it has sort of shooter with a parens S. There may or may not have been two shooters. It's still not clear. They only found shell casings related to Mr. Pettis' firearm. Doesn't that undercut, and then we're now switching to 3C1.1, doesn't that undercut your argument that there was a material hindrance if, even if the police had recovered the firearm earlier or on Mr. Pettis' person, their investigation would have continued? No, Your Honor, because what I'm saying is that at that time, I don't think they knew, had any idea there might be two shooters. I think that, and what I would say is the best evidence of that is that the investigation appears to have the coordinating essentially stopped after that 20 minutes. Once they found him and they realized he was the shooter and they 15 minutes later found the firearm, then they, that was it. There was no concern about an active shooter anymore in Uptown Charlotte in that busy area. All right. Why wasn't the concealment of the firearm contemporaneous with the arrest? Because, Your Honor, there's no evidence in this record that, that Mr. Pettis knew they were coming after him. Where's the case law that says there has to be evidence that he had actual knowledge that police were coming after him? The only, the cases that I found that held that it was contemporaneous in every single case, the defendant is aware that the police are coming after him. So I can only tell you by negative inference. Are they aware because they hear police sirens or they've been told or by very strong circumstantial evidence? They are aware because, for example, in one case it was a boat and they, the folks had already boarded the boat. I can give you the specific case references there in my... Why should that be the rule? Why should we require the person to actually know the police are in hot pursuit in order to find contemporaneous with arrest? Because the whole idea is, the purpose of obstruction of justice is to say, is this person trying to interfere with the investigation? And the idea, and I think it's a generous one under the guidelines, is that if someone is in panic and they just eat the cocaine or flush it down right that second when the police are at the door, we're not going to give them the sort of the, we're not going to assume that there was a plan to interfere with the investigation. Here the facts are so powerful, frankly, in my view, that the police were coming if they weren't already on the scene just by virtue of four or five shots having been fired in downtown Charlotte. Absolutely. There's no question that the police were going to be investigating this act of shooting. Absolutely. But there is no evidence that at the time that he put that gun on top of the wheel that he knew that he had been identified as a potential shooter. None whatsoever. And in fact, when the police came into the parking garage, they didn't accuse him of being one of the shooters. They were concerned because he had something in his head, which may have been a bullet, may have been something that happened that got into his head during the fight. We don't really know. We just know it was a piece of metal. It was a small wound in his head. But the point is that there's no question, as Judge Hyten hypothesized with the movie example, if you shoot someone in the middle of a of a busy street, you're probably going to assume that somebody is going to start looking for the shooter. But if you're walking away before you have any idea that you are a target and you drop that gun in a trash can, that is not contemporaneous with your arrest. And this wasn't contemporaneous with his arrest. He did it before he was ever identified with the suspect. The police let him leave the garage. He had just shot. Absolutely. But it's not the question of guilty conscience. If that were enough, then any time anybody hid anything, whether the police were anywhere on them or not, that would be that's not the rule. The rule is contemporaneous with the arrest. The police let him leave the parking garage. He walked out on his own. Can I take you to material hindrance? Sure. It seems to me the analytic move the government makes is that the material hindrance is of the active shooter investigation that because his response is, look, it's A, you found the gun as opposed to didn't find the gun. It took you like 20 minutes to find the gun. Let's just posit that I think that normally speaking, more than 20 minutes of inconvenience is necessary for material hindrance because otherwise we've drained the notion of material hindrance of any meaningful sense. So normally 20 minutes wouldn't be. And when I see you say in responses, well, it hindered this active shooter investigation because they're like, oh my god, who's shooting at who in downtown Charlotte? The problem is when I look at the comment, it says of the instant defense. It doesn't say hinder the police's investigation of something that I'm not charged with. It says hinders the instant defense. The instant defense is not an act. So help me. Help me why that's not a problem. Relevant conduct. Because the guidelines are going to define the instant offense to include all relevant conduct in connection with the instant offense. It would, right? The guidelines when they talk about offense are including the relevant conduct. Sure. So we're getting pretty broad relevant conduct here from I rob a guy's chain while possessing a gun that puts into motion a series of things that result in a firearm being discharged an hour later. And literally, that turns into an active shooter investigation as relevant conduct. Every, every single bit of it is tied very directly to that robbery. One, two, three, four, 100%. That line is clear. If he doesn't rob Mr. Sally, Mr. Sally doesn't beat him up. He doesn't brandish the firearm. He doesn't take the car keys. Mr. Sally doesn't confront him in downtown Charlotte. Only an hour later. And Mr. Pettis doesn't fire the firearm and there's no active investigation. I will grant you that there are steps there. 100%. That's a, that's a nice way of putting it. And if this court were to hold that, that isn't relevant conduct, then I think we lose on the obstruction argument. Well, I mean, when you take it the way you did this raven, the butterfly effect, then yeah, you could, everything would lead to it. You weren't born 50 years ago. You would be here today. I mean, but what I'm saying is that the weapon was not necessary for the robbery. It wasn't, this wasn't, did he show the weapon then? I thought you just snatched it. No, your honor. Let me, let's go back in two things. First of all, we're not talking about the butterfly effect. We're talking about very direct effect. We're not talking about ripples in an ocean. We're talking about a very direct line that we can, one thing happened and it all caused everything else. If a mouse, whatever, you know, eats a cookie, right? Okay. Now ask for a cookie. In terms of your question about the firearm, this court has held that a firearm is possessed and it facilitates an offense as long as it is at the ready and it can embolden the person. So in Blunt, for example, which is the case that the defendant relies on primarily to that the brandishing wasn't relevant conduct, the defendant went, was found with ammunition. That was the offense of conviction. He had some ammunition. And later they found out that when he stole the ammunition, he also stole a firearm, but there was never any suggestion that he had the firearm at the ready to use during the robbery. This is different. He has the firearm right there and available. And so it would not be clear error for the court to find that that presence of the firearm helped embolden him to rob someone who, Oh my goodness. I just realized I'm a minute 50. When you're answering questions. I apologize. But it looks like the gun didn't embolden much at all. Didn't he start running? Yeah. And then it emboldened him to get Mr. Sally off of him. But that's not emboldening much when you got a gun, when you run the bowling ball, like, yeah, I took your chain and what, what you going to do about it? Instead, he did like an unarmed person did snatch the chain run. Your honor. If this court were to hold that the presence of the firearm was that the district court clearly erred in finding that that could have facilitated this particular robbery, that would be contrary to blunt, which says if it's at the ready and it's available, that's facilitating. It would be contrary to other decisions in the drug context where we say that the presence of a gun can embolden or facilitate a drug trafficking offense, even if the defendant doesn't pull it out. And so that presence of the firearm, and we know he had it at the ready because the minute he got in trouble with this robbery, he pulled it out. So I think that the court certainly couldn't have clearly aired. And I would say the same thing, Judge Boardman. I think you're on the, I just, I don't, I recognize him over the time, but it looks like you want to ask a question. I do have a question. I want to make sure I'm not breaching protocol. May I, judges? Thank you. Why wasn't it an abuse of discretion for the trial judge not to consider the non-frivolous objections to the conditions of release that were submitted five days before the sentencing hearing, admittedly late? I don't need you to focus on the proffered reason for the late submission. Why wasn't it, why didn't the judge abuse his discretion in not considering them? Because the rule supports his decision to choose whether or not to consider them. And I want to, I would take the opportunity to say that with respect to the suggestion that he had to consider them under 3553A, this court in Rogers recognized that part of the reason a district court has to orally pronounce supervised release conditions is to give the defendant an opportunity to say his objections on the record. He did not. This defense attorney said nothing at sentencing hearing about the supervised release conditions until after the judge had imposed them. The judge explained under 3553A why they were appropriate. But he filed the objections on the record five days earlier. That's right. And I will tell you the best answer I have is there's two rules that he violated. One was the rule under rule 39, 32, sorry, and also a local rule that says you have to sentencing memorandum at least seven days before. The court could have exercised its discretion to consider those objections, but there's no legal requirement that a district court judge consider late filed objections, particularly these, which were all of a legal nature, challenging vagueness, delegation doctrine. They didn't argue, there was nothing in those objections about application of 3553A factors. There was actually, there was an objection to the financial requirement, which wasn't reasonably related to this particular defendant. And then the court subsequently had a standing order changed to eliminate that requirement as a matter of course. Fair enough. And I, I did not, when I reviewed those objections, I did not see it specifically pegged to 3553A, but that's, I, I may have missed it. So how do we determine what's an abuse of discretion in the Boyd case involving the same judge? There were five objections to conditions of supervised release, four of which were filed after the PSR timely, one of which was made at the very end of the sentencing hearing. At that point, the judge considered that objection, even though it was very late. Sure. So what's, what's, where are the guardrails here? The guardrails are, it's up to the judge in any particular case to make a decision about whether or not he felt he had the time. This, these were filed on Friday, 10 single spaced. You, you, your honor, your honor found the 3553A reference, those, those objections were not easy for me to figure out exactly what he was arguing and in what way. There were a lot of mentioned conditions without very clear argument. My point being, there is no unwarranted, unwarranted disparity requires a national sort of unwarranted sentence of disparity. He makes sort of a reference to that in his brief. The question is, did that judge on that day feel like he'd had the opportunity to review them? And if he doesn't think so, he has absolutely the discretion to decide, you filed those late, I don't have to consider them. And I know of no case in which this court has held that a district court abuses its discretion when it refuses to consider objections untimely filed in this case, 18 months after the free pre-sentence report was filed. Couldn't we also glean from that, that it doesn't happen very often? Well, you could attempt to your honor, if you were to look and see, I don't think, I will say that it's not that unusual for our judges to decide they're not going to consider objections that are filed untimely. They, sometimes they do, sometimes they don't. You run the risk of that. And, and I think that that's fair. That gives the district court the discretion to decide whether or not under the circumstances they can consider those objections. And the fact that he did consider similar filed objections in another case is of no moment to whether or not he abuses his discretion in this case. Maybe he had time to review them before that sentencing and he didn't because they were filed again in this one. I don't know. If your honors don't have any further questions, the United States asks the court to affirm the judgment of the district court. Thank you, Mr. Mark. Thank you, your honor. All right. A couple of factual clarifications first. As far as the chain snatching, after Sally retrieved the chain from Mr. Pettis, he continued to beat Mr. Pettis and that can be seen in joint appendix 70, 72 and 132. Um, Sally beats Mr. Pettis so severely to the point that an onlooker attempted to intercede. That can be seen in joint appendix 70, 116. So that really does sever the connection between the, um, the chain snatching and the brandishing. Because again, the display was in self-defense from Sally who committed a more serious crime against Mr. Pettis. Secondly, the government mentioned car keys. It's our position the government waived that. We can add that to the list of waivers. The government waived that because they entered into a stipulated offense conduct and that didn't mention anything about car keys and it really supports our self-defense claim that happened in this case. Third, as to Judge Boardman's point, the court should address supervised release conditions head on under Boyd and that didn't happen here. And we also think... Can I just say why your argument can't possibly be right? Because your 3553 argument suggests that you can literally never forfeit a supervised release objection and that can't possibly be right. That if you, you, you could file literally an hour before the sentencing hearing, 25 pages of brand new objections, all of which have been available for you to months and then say the district court is nonetheless required to address all of them. There is no principle of sensible judicial administration that suggests that's true. I completely understand the court's concern there. I think there is some tension between the statute and the federal criminal procedure, but I'll say in, in this case, we don't have that because it's, it's just such clearly a case of good cause here. The filing didn't suggest there was good. Where did you suggest there was good? Where does your client even attempt to meet the statutory good cause, the rules-based good cause standard? Sure. At sentencing, defense counsel said, I believe that, I believe the defense counsel referenced a new standing order that happened. So the timing's kind of important. So the PSR was filed like in November of 2019. No, I just mean when in either the filing or at the sentencing hearing did defense counsel ever say, wow, I realized these are super duper, duper, duper, duper untimely under both the federals of criminal procedure and the local standing rules. I realized that therefore I have to show good cause for the late filing. Here is why I believe I satisfy good cause. Where did that argument ever made? So he didn't specifically state good cause. You're correct. But I think what he said, the court could implicitly assume good cause. And that's kind of what happened in Adu. But there were reasons, the timing I think is important because the PSR was November 2019, I believe. And then we have in the meantime, we have a lot of decisions come out about supervised release conditions from this court. And then we have the court changing the standing order after the PSR. It was January 2021 with the court. And when were these late objections filed? I believe it was May. Yes. So that was used for taking four months to update something in light of a new standing order. Sure. Case law was evolving. It was filed, I believe, five days before. I would point the court's attention to the Raybon case, the sentencing that occurred right before this case. And the court did consider objections that were six days late. And this is a standing order that the court was aware of. I believe the court was aware of these issues. I don't think it would have been burdensome to the court. I don't think it's like a situation where you said if someone files something that the court just isn't aware of and totally catches the court off guard. I just don't think that's the case here. You dropped 10 pages of single-spaced objections on me five days before the sentencing hearing does seem a little burdensome. But I would, again, remind the court, the Boyd decision said court has to face the supervised release conditions head-on, has to address them head-on. And Mr. Pettis' right to make sentencing arguments under 3553A and 3583D, as well as the district court's obligations to address the defendant's sentencing arguments, can provide good cause for untimely objections to the PSR. Did anyone ask for continuance in the sentencing? That's what would have happened in my jurisdiction. No, that didn't. That didn't happen, Your Honor. And I think the court, if the court needed additional time to review, the court could ask, but that didn't happen here. No. And I did have some closing thoughts, if I could have just a little additional time with the court's permission. You may, go ahead. Thank you, Your Honor. I just want to emphasize that Sally's actions caused Mr. Pettis to act in self-defense. After Sally retrieved his chain, he should have reported the crime to police. He didn't do that. Instead, he sought deadly vengeance through a series of more serious crimes that Mr. Pettis could not have reasonably foreseen. But for Sally's brutal assault and attempted murder, Mr. Pettis would not have had to act in self-defense by displaying and discharging the firearm to prevent imminent bodily harm and death. It's the government's burden to disprove self-defense, and they failed to disprove it here because they can't. Mr. Pettis acted in self-defense. His acts of self-defense and his frenzied actions after being shot in the head should not result in these enhancements, which cumulatively doubled his guidelines range from 46 to 58 months to 92 to 115 months. In closing, Mr. Pettis received acceptance of responsibility for pleading guilty to this crime. He has already served five years almost to the day. He has goals. He has life plans, and he hopes that his term of supervision will not be negatively impacted by the overly burdensome conditions imposed in this case. Because of the time he's already served and because the opening brief was filed November 2021, we respectfully request an expedited decision. For all these reasons given to this court, Mr. Pettis respectfully requests this court to vacate his sentence and remand for resentencing. Thank you. Thank you. We're going to take a brief recess. We'll come back with counsel.
judges: Roger L. Gregory, Toby J. Heytens, Deborah Lynn Boardman